UNITED STATES of America,
Plaintiff-Appellee,

v.

Frank J. BEARDSLEE and Frances M.
Beardslee, his wife,
Defendants-Appellants.

No. 75–2466.

United States Court of Appeals,
Sixth Circuit.

Argued April 5, 1977.

Decided Sept. 14, 1977.

Robert G. C. Heaney, Tucson, Ariz., for defendants-appellants.

Frank S. Spies, U. S. Atty., Grand Rapids, Mich., William Kanter, Edwin Huddleson, III, Morton Hollander, Harland F. Leathers, Civ. Div., App. Section, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, CELE-BREZZE, Circuit Judge, and GUY,* District Judge.

GUY, District Judge.

This is an appeal from a judgment in favor of the Small Business Administration (SBA) against guarantors of two promissory notes. The notes were executed by Beardslee Lumber Company, the principal obligor, in favor of National Bank of Hastings and were guaranteed by defendants, Frank J. and Frances M. Beardslee. Subsequent to the notes being assigned to SBA, the principal obligor filed for a Chapter XI arrangement under the Bankruptcy Act, 11 U.S.C. § 701 et seq. Following a series of complicated transactions and negotiations leading to the discharge of the principal obligor, SBA commenced this action against the defendants as guarantors of the notes for the amount that had not been paid prior to the discharge of the principal obligor.

Beardslee Lumber executed two promissory notes on October 22, 1964 and May 3, 1967 for $140,000 and $120,000 respectively. In addition to the guaranties signed by defendants, the two promissory notes were secured by mortgages on the real estate and security agreements covering machinery and equipment of Beardslee Lumber situated in Freeport, Michigan. On January 30, 1968, the National Bank of Hastings assigned to SBA the aforementioned notes and related mortgages and security agreements, including the Guaranty Agreements signed by defendants.

After the notes were in default and maturity accelerated as provided by their terms, SBA submitted to the principal obligor demand letters on February 5, 1968, demanding payment of the full amount of the notes. Payment was not forthcoming. At approximately the same time, Beardslee Lumber filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 722.[1] SBA filed proof of secured and priority claims based upon its two promissory notes and also listed the mortgages and security agreements as security for its claims. Beardslee Lumber filed a Plan of Arrangement pursuant to Chapter XI on April 26, 1968, which was accepted by order of the Bankruptcy Court on June 3, 1968.

Subsequently, on May 1, 1969, following negotiations between Freeport Hardwood Corporation, SBA, Beardslee Lumber, and Marshall B. Kindy, Receiver in Bankruptcy for Beardslee Lumber, Beardslee Lumber filed an amendment to its Plan of Arrangement. The amendment provided that Beardslee Lumber be permitted to convey by quit-claim deeds its real property and transfer its personal property covered by the SBA mortgages and security agreements, respectively, to Freeport Hardwood. The transfer of real and personal property, however, was made subject to the mortgages, security agreements and guaranties executed in favor of SBA. The transfer agreement also provided that Freeport Hardwood shall secure from SBA a release and discharge of Beardslee Lumber from all mortgages and security agreements executed in favor of SBA; however, such release and discharge was without prejudice to any priority or unsecured claims SBA might have against Beardslee Lumber.

As a result of the aforementioned transaction, Freeport Hardwood, on September 9, 1969, executed a promissory note for $126,921.96 to the SBA. This amount was credited to the account of Beardslee Lum-

---

* Honorable Ralph B. Guy, Jr., United States District Judge, for the Eastern District of Michigan, Southern Division, sitting by designation.

1. § 722 provides: "If no bankruptcy proceeding is pending, a debtor may file an original petition under this chapter with the court which would have jurisdiction of a petition for his adjudication."

ber as partial satisfaction of the indebtedness owed SBA. The Freeport Hardwood promissory note was secured by a real estate mortgage, security agreement on personal property and guaranties signed by officers of Freeport Hardwood similar to those executed by defendants. As part of the agreement leading to the execution of the promissory note, SBA agreed that upon the payment of the note by Freeport Hardwood, the security agreements and mortgages against Beardslee Lumber would be discharged. The amendment to the Plan of Arrangement filed by Beardslee Lumber encompassing its agreement with Freeport Hardwood was approved by the Bankruptcy Court by order signed June 9, 1969.

Chronologically, the next event that occurred was a Stipulation for Settlement of Claims of the SBA filed May 20, 1970, which was approved by the Bankruptcy Court on June 22, 1970. This stipulation involved the disbursement of settlement proceeds resulting from certain litigation pending at the time Beardslee Lumber filed its petition for arrangement. Marshall B. Kindy, as receiver for Beardslee Lumber, became a participant in that litigation as a party defendant. Settlement proceeds amounted to $25,000. Of this amount $15,000 was paid for attorneys' fees; $5,000 was turned over to the receiver; and the remaining $5,000 was given to SBA: "to settle all its claims, priority or otherwise, against the above named debtor, which have not been previously settled." The lower court concluded that this stipulation, "together with a prior stipulation entered into December 8, 1969, had the effect, upon ratification by the referee, of discharging the lumber company of any and all further obligation upon the notes in question."

On February 5, 1971, Freeport Hardwood defaulted on its promissory note executed to SBA, and, as a result, suit was commenced for foreclosure of the mortgage and security agreements securing the note and for deficiency judgment on the remaining balance. Freeport Hardwood and the guarantors of the promissory note, Fred L. and Shirley Esslair, settled that lawsuit for $90,000. Furthermore, pursuant to that settlement, SBA discharged the mortgages and security agreements against Beardslee Lumber and Freeport Hardwood. The document discharging Freeport Hardwood states that the indenture of mortgage is "FULLY PAID, SATISFIED AND DISCHARGED," whereas, a similar document relating to Beardslee Lumber states that the indenture of mortgage is "DISCHARGED."

SBA then demanded from defendants payment under their Guaranty Agreements to satisfy amounts which had not been paid as a result of the principal obligor's discharge of the $120,000 and $140,000 promissory notes. Following defendants' refusal to pay, the SBA instituted this litigation. In answer to SBA's claim of liability, appellants argued that under general principles of guaranty law the release and discharge of the principal obligor served to release and discharge their guaranty agreements. The SBA on the other hand argued that this defense was not available to defendants because of Section 16 of the Bankruptcy Act, 11 U.S.C. § 34, which provides that "the liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." Upon the filing of a Motion for Summary Judgment by SBA, the parties stipulated that the case be submitted for decision on the merits under the motion on the basis of the briefs filed and arguments made by the parties and the other records and exhibits then before the court.

The trial court, in concluding that the defendants were liable under the Guaranty Agreements, rejected the arguments advanced by both parties and supported its decision on the following basis:

The more serious question is whether the language of the guaranty waives the defense of a complete release of the principal debtor by the creditor or holder. In the court's opinion it does.

Thus, the lower court held that the language of the Guaranty Agreement, irrespective of the general rules of guaranty law, precluded the appellants' defense of discharge of the principal debtor on an action on the Guaranty Agreement. The court left the issue of damages for further hearing or stipulation by the parties.

On the issue of damages, a stipulation was filed by the parties in which it was agreed that the SBA statement of account for the two promissory notes received from Beardslee Lumber accurately reflected as of a certain date the payments received on such notes. The stipulation further noted that no separate account had ever been carried by the SBA for the defendants. The defendants reserved their right to appeal from the lower court ruling.

After entry of judgment, defendants appealed the adverse ruling of the lower court claiming three points of error: 1) The Guaranty Agreements involved herein, SBA Form 148, do not waive the defense of the discharge of the principal debtor; 2) SBA did not sufficiently prove its damages against appellants, but only established proof of SBA accounts as to Beardslee Lumber, and 3) the lower court was precluded from resting its decision on waiver because neither party raised this issue before the court in their arguments or pleadings. Plaintiff responded by claiming that the lower court's decision was correct and that the Guaranty Agreement defendants had signed waived any defense otherwise available relative to the discharge of the principal obligor. In addition, plaintiff strenuously reiterates the argument raised in and rejected by the lower court that Section 16 of the Bankruptcy Act precludes defendants from raising the discharge of the principal obligor as a defense to this action.

The lower court relied heavily on paragraph two of the Guaranty Agreements in finding that the defendants had waived their defense of discharge of the principal obligor:

The undersigned waives any notice of the incurring by the Debtor at any time of any of the Liabilities, and waives any and all presentment, demand, protest or notice of dishonor, nonpayment, or other default with respect to any of the liabilities and any obligation of any party at any time comprised in the collateral. The undersigned hereby grants to Bank full power, in its uncontrolled discretion and without notice to the undersigned, but subject to the provisions of any agreement between the Debtor or any other party and Bank at the time in force, to deal in any manner with the Liabilities and the collateral, including, but without limiting the generality of the foregoing, the following powers:

(a) To modify or otherwise change any terms of all or any part of the Liabilities or the rate of interest thereon  .   .   . to grant any extension or renewal thereof or any other indulgence with respect thereto, and to effect any release, compromise or settlement with respect thereto.

\*      \*      \*      \*      \*      \*

(d) To consent to the substitution, exchange, or release of all or any part of the collateral, whether or not collateral if any, received by Bank upon any such substitution, exchange, or release shall be of the same or of a different character or value than the collateral surrendered by Bank;

\*      \*      \*      \*      \*      \*

The obligations of the undersigned hereunder shall not be released, discharged or in any way affected, nor shall the undersigned have any rights or recourse against Bank, by reason of any action Bank may take or omit to take under the foregoing powers.

Although the defendants concede that this paragraph grants the bank and its assigns (SBA) "full power . . . to deal in any manner with the liabilities and collateral . . . .," defendants contend that this power is "subject to the provisions of any agreement between the Debtor or any other party and Bank at the time in force." It is the defendant-guarantor's position that there was an agreement in force whereby SBA agreed with the principal obligor to extinguish the debt of the principal and that this agreement also extinguished the obligation of the appellants in this case.

Moreover, defendants, in attacking the lower court's decision, also refer to paragraph three of the Guaranty Agreement:

In case the Debtor shall fail to pay all or any part of the Liabilities when due, whether by acceleration or otherwise, according to the terms of said note, the undersigned, immediately upon the written demand of Bank, will pay to Bank the amount due and unpaid by the Debtor as aforesaid, in like manner as if such amount constituted the direct and primary obligation of the undersigned. Bank shall not be required, prior to any such demand on, or payment by, the undersigned, to make any demand upon or pursue or exhaust any of its rights or remedies against the Debtor or others with respect to the payment of any of the Liabilities, or to pursue or exhaust any of its rights or remedies with respect to any part of the collateral. The undersigned shall have no right to subrogation whatsoever with respect to the Liabilities or the collateral unless and until Bank shall have received full payment of all the Liabilities.

On the basis of this paragraph, defendants argue that they were to be treated as directly and primarily liable on the principal debt only for the purpose of relieving the Bank from the requirements to first demand payment from the principal obligor and to exhaust the collateral before seeking payment from the guarantors.

Plaintiff argues that the District Court's interpretation of the Guaranty Agreements is a correct one based on the clear and express language contained in the agreements and, furthermore, that such an interpretation is supported by substantial case precedent.

Before proceeding further, it is incumbent upon this court to ascertain what law should be applied in interpreting these Guaranty Agreements. Courts interpreting this Guaranty Agreement, SBA Form 148, have varied considerably in the choice of law applied in establishing the rights and obligations created thereunder.

Some courts have considered it necessary to look to state guaranty law, *United States v. Krochmal*, 318 F.Supp. 148, 151 (D.Md. 1970), and *United States v. Vince*, 270 F.Supp. 591, 594 (E.D.La.1967), or federal law, *United States v. Dubrin*, 373 F.Supp. 1123, 1125 (W.D.Tex.1974), or both state and federal law, *Austad v. United States*, 386 F.2d 147, 149 (9th Cir. 1967), while other decisions have ignored state or federal law in favor of the clear language of the guaranty agreement. *United States v. Proctor*, 504 F.2d 954, 957 (5th Cir. 1974), *United States v. Newton Livestock Auction Market, Inc.*, 336 F.2d 673 (10th Cir. 1964), and *United States v. Immordino*, 386 F.Supp. 611, 615 (D.Colo.1974). In *Clearfield Trust Company v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1942), the Supreme Court concluded that under some circumstances federal rather than state law applies to disputes of this nature. Controversies involving the United States Treasury and the rights and duties of the United

States on commercial paper, the Court concluded, dealt with a federal interest of sufficient magnitude to dictate that federal law should govern the rights and obligations of the parties. In rejecting reliance on state law in determining liability of a party paying on a forged endorsement of a check drawn on the United States Treasury, the court noted that "the authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent upon the laws of Pennsylvania or of any other state." *Id.* at 366, 63 S.Ct. at 575. However, the underlying rationale for the Court's holding that federal law should apply was even more basic:

> The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain. *Id.* at 367, 63 S.Ct. at 575.

Subsequently, in *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), the Supreme Court was called upon to decide whether the state coverture law of Texas should apply to a loan made by the Small Business Administration. The SBA negotiated a loan to Mr. and Mrs. Yazell. After the Yazells defaulted on a loan, SBA foreclosed and brought suit for a deficiency judgment. When the SBA sought to satisfy the deficiency with Mrs. Yazell's personal and separate property, the defense was raised that under Texas law a married woman could not bind her separate property unless she had first obtained a court

decree removing her disability to contract. No such court decree had been obtained. The Court concluded that the government's interest in collecting the moneys it has lent is not a sufficient "federal interest" to override the application of state coverture law under the doctrine enunciated in *Clearfield Trust, supra*. However, the Court reaffirmed the *Clearfield Trust* doctrine that federal law may supersede state law where federal programs and actions "by their nature are and must be uniform in character throughout the Nation." *Id.* at 354, 86 S.Ct. at 507. The Court stopped well short of holding that state law applies under all circumstances to loans negotiated by the SBA:

> We decide only that this Court, in the absence of specific congressional action, should not decree in this situation that implementation of federal interest requires overriding the particular state rule involved here. Both theory and the precedents of this Court teach us solicitude for state interests, particularly in the field of family and family-property arrangements. *Id.* at 352, 86 S.Ct. at 507.[2]

Thus, it was left to an individual case-by-case analysis to determine the presence and sufficiency of a "federal interest" in the enforcement of loans negotiated by the SBA. Clearly, the Court's holding in *Yazell* did not forever preclude the application of federal law to SBA negotiated loans.

Recently, this circuit has held, relying on administrative regulation 13 C.F.R. § 101.-1(d), that the Michigan law of coverture does not apply to the enforcement of a SBA loan. *United States v. Lowell*, 557 F.2d 70 (6th Cir. 1977). The Lowells had acted as

---

2. Not only may congressional action manifest a "federal interest" sufficient to override state law, but the Court also noted that agency regulations may serve a similar function: "We do not here consider the question of the constitutional power of the Congress to override state law in these circumstances by direct legislation or by appropriate authorization to an administrative agency coupled with suitable implementing action by the agency." (Footnotes omitted) *Id.* at 352, 86 S.Ct. at 506.

guarantors of a loan executed by the SBA. After the principal obligor defaulted on the loan, a judgment was entered against the guarantors. Although the United States had not yet sought to execute on its judgment against the separate property of Mrs. Lowell, the appellants raised the issue on appeal. In order to expedite resolution of this issue, this court decided that the Michigan law of coverture does not apply to the execution of judgment on a loan by the SBA. In reaching this conclusion, reliance was primarily placed on the "federal interest" manifested in regulation 13 C.F.R. § 101.1(d), promulgated pursuant to congressional authority, 15 U.S.C. § 634, which provides:

> *Applicable law.* (1) Loans made by SBA are authorized and executed pursuant to Federal programs adopted by Congress to achieve national purposes of the U.S. Government.

> (2) Instruments evidencing a loan, obligation of security interest in real or personal property payable to or held by the Administration or the Administrator, such as promissory notes, bonds, guaranty agreements, mortgages, deeds of trust and other evidences of debt or security shall be construed and enforced in accordance with applicable Federal law.

Thus, in *Lowell*, the "federal interest" which the Supreme Court found lacking in *Yazell* had been satisfied by the promulgation of the aforementioned regulation by the SBA under authority of Congress.

■ On the basis of our holding in *Lowell*, the SBA regulation cited, and the *Clearfield Trust* doctrine, we conclude that federal law should also apply in the resolution of the issue before us in this case. Whether the "federal interest" manifested in the SBA regulation will always be sufficient to override state law in the interpretation and enforcement of SBA loans is a question we are not required to reach;[3] however, it would appear clear that future application of state law to SBA loans will face more stringent analysis and scrutiny in light of the "federal interest" found in this case and in *Lowell*.

■ In determining the substantive content of the federal law applicable to this case, the court is faced with no federal appellate and only one federal district court decision dealing with the issue presented here. Moreover, in light of the conclusion reached that federal law applies, the one federal district case, *United States v. Krochmal, supra*, is inapposite since it rested its decision on the basis of Maryland and District of Columbia law. Thus, this court is faced with the task of formulating a federal rule of law where no relevant federal precedent exists. In the instant case, we find the language of SBA Form 148 clear and unambiguous on its face, *United States v. Proctor, supra; United States v. Newton Livestock Auction Market, Inc., supra*, and *United States v. Immordino, supra*, and therefore, interpretation of the agreement is a question of law.

■ Although the Guaranty Agreements signed by defendants indicate defendants are acting as guarantors of the principal debt, there is nothing from this fact alone that would preclude these appellants from being held principally liable on the promissory notes. *Walter Lambert Pharmaceutical Co. v. Sylk*, 348 F.Supp. 1039 (E.D.Pa. 1971), and *Bank of Italy National Trust and Savings Asso. v. Symmes*, 118 Cal.App. 716,

---

3. In another case decided by this circuit, *Weinstein v. United States*, 511 F.2d 56 (6th Cir. 1975), it was held that compliance with state law did not interfere with a federal interest and thus applied state law. The state law of Ohio governed the validity of a waiver of notice provision in the guaranty agreement with respect to the sale of collateral pledged by the debtor to secure the loan. It should be noted, however, at the time *Weinstein* was decided, the regulation manifesting "federal interest" in the interpretation and enforcement of SBA loans was only two months old and it is likely that it was not brought to the attention of the court at that time.

5 P.2d 956, 958 (1931). See also, *Restatement of the Law, Security* (1944), § 82(g), pp. 231–32.

Numerous state court decisions dealing with the continued liability of guarantors after discharge of the principal obligor have held that the discharge of the principal obligor does not relieve the guarantor of liability where the right of recourse against the guarantor is expressly reserved in the contract releasing or discharging the principal obligor, *Bank of Italy National Trust & Savings Asso. v. Symmes, supra,* (statutory basis); *Lilenquist Motors, Inc. v. Monk,* 64 Wash.2d 187, 390 P.2d 1007 (1964), (partial discharge); *Continental Bank & Trust Co. v. Akwa,* 58 Wis.2d 376, 206 N.W.2d 174 (1973), or in the guaranty contract. *Coghlin v. Smith,* 163 Wash. 290, 1 P.2d 215 (1931); *Fruehauf Trailer Company of Canada, Ltd. v. Chandler,* 67 Wash.2d 704, 409 P.2d 651 (1966);[4] *Warner Lambert Pharmaceutical Co. v. Sylk, supra; United States v. Krochmal, supra,* and *Restatement of the Law, Security* (1941) § 122, at 322.

■ In *Krochmal, supra,* at 151, in interpreting the same SBA Form 148 as involved in this case, the federal district court found that the laws of Maryland and the District of Columbia provided that the language of Form 148 "amounted to a consent by the guarantors that the release of the principal debtor did not discharge the guarantors." Although no decisions have applied federal law in reaching this result, we conclude that federal law should embody the construction of this language in Form 148 that was made in *Krochmal.* Based on a reasonable interpretation of the clear and unambiguous language contained in Form 148, we conclude that as a matter of federal law the release of the principal debtor did not discharge the obligation of the guarantors under this agreement.

The arguments advanced to this court by the defendants for a contrary result are not persuasive. Contained as part of the "full powers" granted the guarantee in the Guaranty Agreement is the power to "deal in any manner with the Liabilities and the collateral, including, but without limiting the generality of the foregoing, the following powers: '(a) . . . to effect any release, compromise or settlement with respect thereto [Liabilities].' " There is no merit to the appellants' argument that the aforementioned guarantee's "full power" which is "subject to the provisions of any agreement between the Debtor . . . and Bank at the time in force" was thereby limited by the discharge between Beardslee Lumber and SBA because such discharge was an agreement by the debtor limiting the guarantee's otherwise "full power" to effectuate a release or settlement of the debtor's liability. Such a construction of this Guaranty Agreement would render a nullity to subsection (a) of paragraph two of the agreement because any release, compromise, or settlement will be accomplished by agreement with the debtor. The limiting provision in the Guaranty Agreement cited by defendants relating to "any agreement between the Debtor . . . and the Bank . . ." must be interpreted to relate only to agreements by the debtor and guarantee limiting the otherwise "full power" of the guarantee to deal with the liabilities and collateral vis-a-vis the debtor, and these limitations, in turn, would apply to restrict the otherwise "full power" the guarantee would have against the guarantors. The discharge agreement between the guarantee (SBA) and the principal obligor in the instant case in no way was intended to limit the "full power" of the guarantee under the Guaranty Agreement; rather, the agreement between the debtor and SBA was in effectuation of the guarantee's "full power." It would be an anoma-

---

4. The court, faced with very similar language in the guaranty agreement as found in the instant case, concluded:

In clear and unambiguous terms, the guaranty agreement waived the defense of release or discharge by providing that 'The liability of the undersigned * * * shall not be affected * * * by the discharge or release of any obligation of PIX.' We hold that the quoted provision of the agreement constituted a full and complete waiver by the guarantors of the defense that the principal obligation had been discharged. *Id.* at 654.

lous result if a debtor's agreement in effectuation of the Guaranty Agreement served to limit the guarantee's rights under the same Guaranty Agreement. Such an interpretation is not reasonable nor could it have been within the intention of the parties involved.

In light of the construction given by the court to paragraph two of the Guaranty Agreement, defendants' interpretation of paragraph three of the same agreement becomes inconsistent and untenable. Paragraph three deals with those circumstances where the principal obligor has defaulted on its loan and an amount remains "due and unpaid by the Debtor." Paragraph two deals with the situation where the guarantee has decided to effectuate a release, compromise, or settlement with respect to the liabilities or collateral of the debtor. Thus, any language inconsistency between paragraphs two and three is due to the different purposes for which they were intended. When the language of these two paragraphs is read in the context of the facts in this case, it is clear that it is paragraph two and not paragraph three that controls.

In addition, plaintiff asserts another reason for affirmance of the district court's decision. Based upon Section 16 of the Bankruptcy Act, 11 U.S.C. § 34, *supra*, plaintiff argues that the discharge of Beardslee Lumber ratified in the bankruptcy proceeding does not alter the liability of defendants. The district court rejected plaintiff's Section 16 argument, finding that Beardslee Lumber's discharge was not by order of the bankruptcy court, but by express agreement with the creditor. In this regard, the court concluded that the agreement to discharge the debtor was only ratified by the referee in bankruptcy, but that this did not constitute a discharge in bankruptcy and, thus, not within the purview of Section 16. In light of the court's ruling that defendants are not released from their obligation as guarantors as a result of the discharge of the principal obligor, it is not necessary for us to treat

additionally the Section 16 issue raised by plaintiff.

The court finds no merit in defendants' other two claims of error. Proof of unpaid amounts on the account of Beardslee Lumber was sufficient to establish damages under the Guaranty Agreements, in light of the court's previous discussion, even though Beardslee Lumber was discharged from those debts.

■ Also, the lower court did not err in relying on the contract waiver issue for its decision. The Guaranty Agreements had been placed in evidence and interpreting the language of such agreements was an integral part of the court's task in rendering a decision. The district court's interpretation of the agreements in a manner and on a basis not urged by either party is not reversible error, but, rather, is within the discretion of a court faced with an interpretation of a written agreement.

The Judgment of the District Court is Affirmed.